United States District Court
Southern District of Texas
**ENTERED**
September 30, 2024
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **CORVAL BUILDERS & ERECTORS, INC.** | § § § | |
| **Plaintiff,** | § § | |
| **v.** | § § | **Civil Action No. 4:21-cv-01268** |
| **MARKEL AMERICAN INSURANCE COMPANY,** | § § § | |
| **Defendant.** | § § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Coverage or no coverage—that is the question in this insurance dispute.  In 2018, Plaintiff Corval Builders & Erectors, Inc. ("Corval") discovered that Paragon Fabricators, Inc. ("Paragon"), a subcontractor it hired, made mistakes in fabricating pipes for a construction project in Corpus Christi, Texas.  Corval filed an insurance claim under a policy from Defendant Markel American Insurance Company ("Markel"), but Markel denied it alleging the policy excluded coverage.  Corval disagreed and challenged Markel's decision here.

Pending before the Court is Markel's Motion for Summary Judgment.  (Dkt. No. 35).  For the reasons below, the Court **GRANTS** the Motion.

## I.      BACKGROUND[1]

This case arises out of a contractor-subcontractor relationship.  In October 2017, Corval agreed to fabricate,[2] construct, and install pipes for a construction project in Corpus Christi, Texas (the "Project").  (Dkt. No. 1 at 2-3); (Dkt. No. 37-3 at 3); (Dkt. No. 39 at 1–2).  That same month, Corval hired Paragon as a subcontractor to fabricate piping for the Project.  (Dkt. No. 37-3 at 3); (Dkt. No. 39 at 2).  As a pipe fabricator, Paragon was responsible for creating or customizing pipes for the Project so that they fit its exact requirements.

Paragon started work on the pipes in late 2017.  (Dkt. No. 1 at 5); (Dkt. No. 39 at 2).  Magellan Midstream Partners, L.P. ("Magellan") shipped sections of pipe, related pipe fittings, and other components to Paragon's workshop, where Paragon welded the components to fit the Project's needs.  (*See* Dkt. No. 1 at 5); (*see also* Dkt. No. 40-2 at 13). In connection with this work, Paragon took out a property-insurance policy with Markel (the "Policy") covering the workshop.  (Dkt. No. 38 at 2-3); (Dkt. No. 37-1).

In January and February 2018, Corval discovered that some of Paragon's work was defective.  (Dkt. No. 37-6 at 2).  Corval notified Paragon in March, (*id.*), and again in April

---

[1]      Except where noted, this section contains only undisputed facts, and all facts and reasonable inferences have been construed in favor of the nonmovant.  *Renfroe v. Parker*, 974 F.3d 594, 599 (5th Cir. 2020).  The Court has not weighed evidence or made credibility findings.  *Id.*

[2]      Pipe fabrication refers to the manufacturing and assembly of the components that make up a piping system.  *See What Is Pipe Fabrication? The Process of Piping Fabrication*, PipingTechs, https://pipingtechs.com/what-is-pipe-fabrication-the-process-of-piping-fabrication/ (last visited Sept. 28, 2024).  This typically includes tasks like cutting, bending, welding, and assembling pipes and fittings.  *See id.*  These steps are often done off-site in a workshop where skilled labor ensures precision according to design specifications.  *See id.*

2018, (Dkt. No. 37-7 at 2).  Corval outlined Paragon's failures to meet delivery times and production standards for the Project.  (*Id.*).  Corval further claimed that Paragon's default caused delay and damages under its purchase order with Corval and Corval's contract with Magellan, the Project owner.  (*Id.*).  One month later, Magellan fired Corval, (Dkt. No. 37-9 at 2), and back-charged Corval $1,631,585.00 for losses from Paragon's failure of performance, (Dkt. No. 37-3 at 4).  The Parties dispute how much (if any) of the $1,631,585.00 results from damage to Magellan's pipe components and how much (if any) results separately from defects in the construction or workmanship of the fabricated pipes.  *Compare* (Dkt. No 36 at 14) (citing Dkt. No. 37-10 at 13) *with* (Dkt. No. 38 at 8, 13) (first citing Dkt. No. 39 at 2; and then citing Dkt. No. 40-1 at 31, 34).  In September 2018, Corval submitted a claim to Markel under Paragon's Policy for damages to the pipes.  (Dkt. No. 40-3 at 2); (Dkt. No. 38 at 4).  Corval pursued the claim, (*see* Dkt. No. 40-3 at 2) (listing Corval as claimant), because Paragon was in bankruptcy, (*see* Dkt. No. 37-5 at 4).[3]

Markel denied the claim for three reasons: (1) the pipes were not "covered property"; (2) the damages to the pipes did not occur at a "covered location"; and (3) the damages to the pipes did not constitute "physical loss."  (Dkt. No. 37-7 at 2–5).  Markel also noted that even if the claim were covered, "Exclusion 'f,' barring coverage for loss resulting from the design, specification, construction, workmanship, installation, or maintenance of property, would apply."  (*Id.* at 4).

---

[3]      Paragon filed for Chapter 11 bankruptcy in December 2017.  (Dkt. No. 1 at 6); (Dkt. No. 37-5 at 6).  In May 2018, the case was converted to a Chapter 7.  (Dkt. No. at 7).  In July 2018, Corval filed a proof of claim in the proceeding.  (*Id.*).  The next month, the bankruptcy court permitted Corval to make insurance claims on Paragon's policies.  (*Id.*).

Corval, as Paragon's subrogee, filed this suit asserting breach of contract under the Policy and extracontractual claims for violations of Sections 541 and 542 of the Texas Insurance Code.  (Dkt. No. 1 at 1, 11–16).  Corval also seeks a declaratory judgment that its claim is covered.   (*Id.* at 10, 16–17).  Markel moves for summary judgment on all of Corval's claims.  (Dkt. No. 36).

## II.   LEGAL STANDARD

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it could affect the suit's outcome under governing law.  *Renwick v. PNK Lake Charles, LLC*, 901 F.3d 605, 611 (5th Cir. 2018) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).  And "[a] dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *TIG Ins. v. Sedgwick James*, 276 F.3d 754, 759 (5th Cir. 2002) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion" and identifying the record evidence that "it believes demonstrate[s] the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).

If the movant meets this burden, the nonmovant must come forward with specific facts showing a genuine issue for trial.  Fed. R. Civ. P. 56(c); *see also Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986).  The nonmovant must "'go beyond the pleadings and by [the nonmovant's] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'"  *Nola Spice Designs, LLC v. Haydel Enters.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553).  "The nonmovant must 'identify specific evidence in the record and . . . articulate the precise manner in which that evidence supports his or her claim.'"  *Carr v. Air Line Pilots Ass'n, Int'l*, 866 F.3d 597, 601 (5th Cir. 2017) (per curiam) (quoting *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)), *as revised* (July 14, 2017).  If evidence is merely colorable or not significantly probative, summary judgment is appropriate.  *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 378 (5th Cir. 2019) (citing *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511).

In reviewing a motion for summary judgment, the district court views the evidence in the light most favorable to the nonmovant.  *Carr*, 866 F.3d at 601.  This means that courts must resolve factual controversies in the nonmovant's favor, "but only when . . . both parties have submitted evidence of contradictory facts."  *Little*, 37 F.3d at 1075.

## III.   DISCUSSION

Markel has moved for summary judgment on four grounds.  First, Corval's coverage claim is for defective workmanship or construction, which is excluded under

the Policy.  (Dkt. No. 36 at 8–15).  Second, because Corval's coverage claim fails, the extracontractual claims fail as well.  (*Id.* at 15–17).  Third, Corval's claim is limited to $600,000 under certain Policy provisions.  (*Id.* at 17–18).  And fourth, Corval's request for declaratory judgment is redundant to the breach-of-contract claim.  (*Id.* at 18).

### A.   THE BREACH-OF-CONTRACT CLAIM

Corval argues that Markel breached the insurance contract by failing to provide coverage.  (Dkt. No. 1 at 11).  Markel responds that Corval's coverage claim is excluded under the Policy.  (Dkt. No. 36 at 8–15).  In other words, the breach-of-contract issue turns on the scope of coverage under the Policy.

Under Texas law,[4] "insurance policies are interpreted in accordance with the rules of construction that apply to all contracts generally."  *Sharp v. State Farm Fire & Cas. Ins.*, 115 F.3d 1258, 1260 (5th Cir. 1997) (citing *Nat'l Union Fire Ins. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995)).  They are strictly construed against the insurer.  *Puckett v. U.S. Fire Ins.*, 678 S.W.2d 936, 938 (Tex. 1984).  But this strict-construction rule applies only if the policy is ambiguous.  *Sharp*, 115 F.3d at 1261.

Whether an insurance policy is ambiguous is a question of law.  *Nat'l Union Fire Ins.*, 907 S.W.2d at 520 (*Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983)).  "The fact that the parties disagree as to coverage does not create an ambiguity, nor may extrinsic evidence be admitted for the purpose of creating an ambiguity."  *Sharp*, 115 F.3d at 1261 (citing *Nat'l Union Fire Ins.*, 907 S.W.2d at 520).  A court first examines a policy's plain language, and

---

[4]   The Parties agree that Texas law applies.  (Dkt. No. 38 at 15) ("Both parties agree that Texas law governs the Policy.").

"'[w]hen there is no ambiguity, it is the court's duty to give the words used their plain meaning.'" *Id.* (quoting *Puckett*, 678 S.W.2d at 938).

With these principles in mind, the Court turns to the scope of coverage under the Policy. Markel "cover[s] direct physical loss to covered property at a 'covered location' caused by a covered peril." (Dkt. No. 37-1 at 46). Based on this, there are three elements to coverage: (1) the loss must occur at a "covered location"; (2) the loss must be to "covered property"; and (3) the loss must be caused by a "covered peril." As the last element forms the bulk of the Parties' dispute, (Dkt. No. 42 at 8–9), the Court address the first two only briefly.

### 1.   <u>Covered Location</u>

First, the Policy covers two locations: 500 Main Street and 412 Main Street in La Marque, Texas. (*Id.* at 95). Paragon damaged the pipes at 500 Main Street. (*See* Dkt. No. 36 at 3, 17–18); (Dkt. No. 38 at 12–13). The loss occurred at a covered location.

### 2.   <u>Covered Property</u>

Second, the Policy covers "Business Personal Property." (Dkt. No. 37-1 at 46–47). The term "Business Personal Property" includes (1) "personal property which will become a part of [Paragon's] installation, fabrication, or erection project;" and (2) "personal property of others," including the "personal property of others that is in [Paragon's] care, custody, or control." (Dkt. No. 37-1 at 47).

Both the fabricated pipes and the individual pipe components fall within these subcategories. Magellan, the Project owner, supplied the pipe components for Paragon's fabrication work. (*See* Dkt. No. 1 at 5); (*see also* Dkt. No. 40-2 at 13). And as a result,

Magellan also owned the assembled pipe that Paragon fabricated from these components. (*See* Dkt. No. 1 at 5); (Dkt. No. 40-2 at 13). Further, regardless of ownership, both the individual pipe components and the fabricated pipes would become "part of [Paragon's] . . . fabrication . . . project" while at the workshop. (Dkt. No. 37-1 at 47). The fabricated pipes and the individual pipe components were covered property.

### 3.   <u>Covered Peril</u>

Third, and the heart of the Parties' dispute: whether the loss resulted from a covered peril. The Policy "cover[s] risks of direct physical loss unless the loss is limited or caused by a peril that is excluded." (Dkt. No. 37-1 at 57). The Court turns, then, to the language of the exclusion at issue here.

### a.   <u>Exclusion (f)</u>

Though the Policy has many exclusions, Markel relies on just one: Exclusion (f).[5] Exclusion (f) has two parts. First, there is the exclusion providing that Markel "do[es] not pay for loss which results from . . . an act, error, or omission (negligent or not) relating to . . . the design, specification, construction, workmanship, installation, or maintenance of property." (Dkt. No. 37-1 at 60). Second, there is an ensuing-loss clause[6] (an exception

---

[5]   Markel's Motion invoked only Exclusion (f) and focused almost exclusively on the "construction" and "workmanship" exclusions. (Dkt. No. 36 at 8–12). The Court's discussion of the "construction" and "workmanship" exclusions in Exclusion (f) does not affect the application of other exclusions in the Policy (whether in Exclusion (f) or elsewhere), should any apply.

[6]   Ensuing-loss clauses "'act as exceptions to property insurance exclusions and operate to provide coverage when, as a result of an excluded peril, a covered peril arises and causes damage.'" *Balfour Beatty Constr., LLC v. Liberty Mut. Fire Ins.*, 968 F.3d 504, 511 (5th Cir. 2020) (quoting Barry R. Ostrager & Thomas R. Newman, Handbook on Insurance Coverage Disputes § 21.04(g) (16th ed. 2013)). In *Balfour Beatty*, the Fifth Circuit interpreted nearly identical language as an ensuing-loss clause, "[a]lthough the Exception d[id] not use the word 'ensuing.'" *Id.*

to the exclusion) providing that "if a defect, error, or omission . . . results in a covered peril," Markel pays for "the loss or damage caused by that covered peril." (*Id.*). Working together, these two provisions mean that, under Exclusion (f), resulting losses are not covered if there is a problem like a defect, error, or mistake in construction. But if that problem causes something else to happen that is covered—like a fire or a flood—then Markel must pay for the damage caused by that covered event.

### b.   Defining the Exclusion Part of Exclusion (f)

The Court must first examine what is "excluded" under Exclusion (f) to determine whether the contested damage was covered. The exclusion in Exclusion (f) says that Markel "do[es] not pay for loss which results from . . . an act, error, or omission (negligent or not) relating to . . . the design, specification, construction, workmanship, installation, or maintenance of property." (Dkt. No. 37-1 at 60).

Of the six terms in the exclusion, the Parties focus on two: "construction" and "workmanship." (*See* Dkt. No. 42 at 1); (*see also* Dkt. No. 38 at 17-18) (citing Dkt. No. 40-1 at 43, 46). Markel argues that the loss stems from defective "construction" and "workmanship" in creating the fabricated pipes and is therefore not covered. (Dkt. No. 36 at 8–12). Corval responds that the "workmanship" and "construction" exclusions do not exclude all of its losses. (Dkt. No. 38 at 15–21). As the Policy does not define "construction" or "workmanship," the Court must first determine their meaning before attempting to apply them.

The dictionary is a good starting point. *See, e.g.*, *Mescalero Energy, Inc. v. Underwriters Indem. Gen. Agency, Inc.*, 56 S.W.3d 313, 320 (Tex. App.—Houston [1st Dist.]

2001, pet. denied) (stating that Texas courts often look to dictionaries to determine the ordinary and generally accepted meaning of contract terms).  According to Merriam-Webster Online, "construction" means "the process, art, or manner of constructing something."[7]  "Constructing" means "to make or form by combining or arranging parts or elements."[8]  And "workmanship" means "the quality imparted to a thing in the process of making."[9]  Other dictionaries contain similar definitions.[10]

Applying these definitions to the language of Exclusion (f), the "construction . . . of property" means the process, art, or manner in which the property was made or formed, and the "workmanship . . . of property" means the quality imparted to the property in the process of making it.  (Dkt. No. 37-1 at 60).

---

[7]   *Construction*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/construction (last visited Sept. 28, 2024).

[8]   *Constructing*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/constructing (last visited Sept. 28, 2024).

[9]   *Workmanship*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/workmanship  (last visited Sept. 28, 2024).

[10]   *See, e.g.*, *Construction*, Oxford English Dictionary, https://www.oed.com/dictionary/construction_n?tab=meaning_and_use&tl=true (last visited Sept. 28, 2024) (defining "construction" as "[t]he action of framing, devising, or forming, by the putting together of parts; erection"); *Workmanship*, Oxford English Dictionary, https://www.oed.com/dictionary/workmanship_n?tab=meaning_and_use (last visited Sept. 28, 2024) (defining "workmanship" as "[t]he (degree of) skill, art, or craftsmanship with which a task is done or a product made").

"An ordinary and generally-accepted meaning of 'construction' is "the process . . . of constructing something.'"  *Balfour Beatty Constr., LLC v. Liberty Mut. Ins. Co.*, 366 F. Supp. 3d 836, 841 (S.D. Tex. 2018) (quoting Merriam-Webster's Collegiate Dictionary 268 (11th ed. 2007)), *aff'd*, 968 F.3d 504 (5th Cir. 2020); *see also Engineered Structures, Inc. v. Travelers Prop. Cas. Co. of Am.*, 822 F.App'x 606, 609 (9th Cir. 2020) (interpreting "construction" in a policy with nearly identical terms as "a term referring to the 'process' in completing the covered project"); *5333 Mattress King LLC v. Hanover Ins. Co.*, 683 F. Supp. 3d 1188, 1199 (D. Colo. 2023) (same) (collecting cases).

Caselaw and context reinforce these understandings.  For example, the Fifth Circuit observed:

> "A defect in workmanship is a defect in the way some part of the (insured property) is constructed . . . ." [T]he [defective-workmanship] clause excludes coverage for damages "resulting from defects in the product caused by faults in the construction process . . . It is the quality of the product which is excluded from coverage, and not damage to the product caused by negligence during the construction process."

*U.S. Indus., Inc. v. Aetna Cas. & Sur. Co.*, 690 F.2d 459, 462 (5th Cir. 1982) (first quoting *Equitable Fire & Marine Ins. v. Allied Steel Constr. Co.*, 421 F.2d 512, 514 (10th Cir. 1970); and then quoting *City of Barre v. N.H. Ins.*, 396 A.2d 121, 122–23 (Vt. 1978)).  The "negligence" referenced there is "fortuitous damage to construction property *extraneous to the construction of the product itself*," not damage resulting from part of the construction process.  *Id.* (emphasis added).

The associated-words canon provides support.  Under this canon, "[w]hen several nouns or verbs or adjectives or adverbs—any words—are associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar."  Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 195 (2012); *see also United States v. Koutsostamatis*, 956 F.3d 301, 307 (5th Cir. 2020) ("'a word may be known by the company it keeps[]'" (quoting *Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 287, 130 S.Ct. 1396, 176 L.Ed.2d 225 (2010))).  Here, three of the other six terms—"design," "specification," and "installation"—relate to how the property was made or set up.  By contrast, only one of the six terms—"maintenance"—extends beyond when the

property was initially made or assembled.  The associative principle among "design," "specification," "construction," "workmanship," "installation," and "maintenance" is the terms' connection to the initial creation and setup of "property," with "maintenance" addressing ongoing acts required to keep the property in working order.

This context confirms (1) that the "construction . . . of property" is the process, art, or manner in which the property was made or formed; and (2) the "workmanship . . . of property" is the quality imparted to the property in the process of making it.  (Dkt. No. 37-1 at 60).

c.    Applying the Exclusion Part of Exclusion (f)

With this understanding of Exclusion (f) in mind, the question is whether the "loss" for which Corval seeks coverage "results from . . . an act, error, or omission (negligent or not) relating to" the construction or workmanship "of property."  (Dkt. No. 37-1 at 60).  The answer is yes.  But the analysis differs slightly depending on what is considered the relevant "property."

Markel argues that the assembled, fabricated pipes are the only relevant "property" because Corval's "claimed damages derive only from labor, equipment rental, and welding filler metal to fix the defaults" in the fabricated pipe.  (Dkt. No. 36 at 14) (citing Dkt. No. 37-10 at 13).   In other words, Markel contends that none of the $1,631,585.00 in losses comes from damage to the individual pipe components.

Corval disagrees arguing that "Magellan withheld payments otherwise due and owing to Corval totaling $1,631,585.00" because of "the physical damage sustained by the Project's pipes."  (Dkt. No. 38 at 8) (citing Dkt. No. 39 at 2).  And Corval's CEO stated

under oath that Paragon "substantially damaged Magellan's property, creating a need to remove and replace pipeline components rendered unusable," and that "Magellan compelled Corval to pay for the costs of replacing the Project's pipes." (Dkt. No. 37-3 at 3). Even Markel's coverage-disclaimer letter states that "Magellan claims that it replaced most of the pipe provided by Corval (and fabricated by Paragon) at a total cost of $1.7 million dollars." (Dkt. No. 37-7 at 3). Still, Corval has not proven exactly how much, if any, of the $1,631,585.00 comes from the cost of replacing the damaged pipe components.[11]

### i.     The Assembled, Fabricated Pipes

Taking the assembled, fabricated pipes as the relevant "property," the defects caused by Paragon's fabrication work are defects in the "construction [or] workmanship . . . of [the] property." (Dkt. No. 37-1 at 60). Exclusion (f) thus excludes any "direct physical loss,"[12] (Dkt. No. 37-1 at 57), to the fabricated pipes resulting from these defects. (*Id.*).

---

[11]    Markel cites Corval's November 1, 2022, corporate-representative deposition for the fact that "none of [Corval's] costs . . . are from . . . the cost of any property potentially covered under the Policy." (Dkt. No. 36 at 14) (citing Dkt. No. 37-10 at 13). Though the testimony in this snippet of the deposition transcript seems to support Markel's claim, it is unclear. After this deposition, Corval's CEO and corporate representative, Paul Jordan, reaffirmed his prior statement that Magellan withheld the $1,631,585.00 "[b]ecause of the physical damage sustained by the Project's pipes." (*See* Dkt. No. 39 at 2) (Declaration of Paul Jordan) (December 9, 2022). Were it material to the outcome, this statement (along with those quoted above) would create at least a fact issue as to whether some of Corval's damages come from the cost of replacing the damaged pipe components. But as explained below, it does not matter—coverage is excluded in any case.

[12]    Markel also contends that "none of Corval's claimed losses" are direct physical losses, "but instead are all for unrecoverable income losses." (Dkt. No. 42 at 10). The record is unclear about the costs that make up the $1,631,585.00 figure. Regardless, Exclusion (f) excludes any losses resulting from defects in the assembled, fabricated pipe—whether or not they can be characterized as "direct physical loss[es]." (Dkt. No. 37-1 at 57).

Corval's CEO describes the three basic defects in Paragon's fabrication work:

> [1] Paragon, without specific written approval from Corval or from Magellan, welded external attachment welds to pipes and fittings on the Project . . . [2] In addition, Paragon performed multiple repairs to previous repairs . . . [3] Further inspection of Paragon's welds on the Project's pipes show that Paragon's welds were otherwise defectively and negligently performed.

(Dkt. No. 37-3 at 2–4). Markel contends that these are all defects in the construction or workmanship of the fabricated pipes. (Dkt. No. 36 at 8–12).

The Court agrees. Each of these defects plainly relates to (1) construction (i.e., the process, art, or manner in which the fabricated pipes were made or formed); or (2) workmanship (i.e., the quality imparted to the fabricated pipes in the process of making them).

Corval responds that it "has always contended that the damage to the Project's pipes was caused primarily by Paragon's ***mishandling of the pipes*** — dropping them, moving them around using metal chokers (which harmed the pipes' coating) rather than with nylon straps, harming the pipes' beveled ends, and so on." (Dkt. No. 38 at 19) (emphasis in original). Corval gains nothing from this characterization. "Mishandling" materials in the process of making something from them *is* a defect in construction or workmanship. Paragon's handling (or mishandling) of the pipe components was part of the process, art, or manner in which the fabricated pipes were made or formed (i.e., "construction"). And Paragon's mishandling of the pipe components also bears on the quality imparted to the fabricated pipes in the process of making them (i.e., "workmanship").

14

In short, the defects caused by Paragon's fabrication work—including those caused by mishandling—are defects in the construction or workmanship of the fabricated pipes.  The loss resulting from these defects is therefore excluded by Exclusion (f).

### ii.     The Individual Pipe Components

Taking the individual pipe components as the relevant "property," however, the analysis is slightly different.  Recall that the "construction . . . of property" is the process, art, or manner in which the property was made or formed, and the "workmanship . . . of property" is the quality imparted to the property in the process of making it.  Paragon did not make the individual pipe components.  (*See* Dkt. No. 1 at 5); (*see also* Dkt. No. 40-2 at 13).  So, the damage Paragon caused to the pipe components is not a defect in the "construction" or "workmanship" of that property.  (Dkt. No. 37-1 at 60).  At first glance, then, the damage to the individual pipe components is a covered peril, and the "loss" (if any) resulting from the damage to the pipe components—for example, the cost of replacing unusable components—would not be excluded.

But the plain language of Exclusion (f) requires the Court to consider the cause of the damage to the pipe components.  Exclusion (f) excludes "loss which *results from* . . . act[s], error[s], or omission[s] (negligent or not) relating to . . . construction [or] workmanship . . . of property."  (Dkt. No. 37-1 at 60) (emphasis added).  Here, the damage to the individual pipe components—even if not itself excluded—*results from* Paragon's defective construction and workmanship of the fabricated pipes.

Corval did not allege and has not shown any cause of the damage other than Paragon's defective fabrication work.  Indeed, Corval says that it "has always contended

that the damage to the Project's pipes was caused primarily by Paragon's ***mishandling of the pipes.***" (Dkt. No. 38 at 19) (emphasis in original).  If that is true, it would show that the damage to the pipe "results from," (Dkt. No. 37-1 at 60), Paragon's defective construction and workmanship.  Corval, in short, has not "identif[ied] specific evidence in the record [or] articulate[d] the precise manner in which that evidence supports," *Carr*, 866 F.3d at 601, the existence of any cause for the damage to the pipe components other than Paragon's defective construction or workmanship.  So, even if the individual pipe components were the relevant property, the loss would be excluded.

### d.   The Ensuing-Loss Clause

But while the damage to the pipe components is excluded, an exception to the exclusion might reinstate coverage.  Accordingly, the Court must look at the ensuing-loss clause in Exclusion (f), a clause that—in some cases—reinstates coverage when an excluded peril results in a (potentially) covered peril.

Recall that under Exclusion (f)'s ensuing-loss clause, "if a defect, error, or omission . . . results in a covered peril," Markel "cover[s] the loss or damage caused by that covered peril."  (Dkt. No. 37-1 at 60).  Here, defects in the construction and workmanship of the fabricated pipes (excluded perils) resulted in damage to the individual pipe components (a potentially covered peril).

The Fifth Circuit discussed the application of ensuing-loss clauses under Texas law in *Balfour Beatty Construction, LLC v. Liberty Mutual Fire Insurance Co.* 968 F.3d 504 (5th

Cir. 2020).  There, slag[13] from a welding project on the upper floors of an under-construction building fell down the side of the building and damaged windows on the lower floors.  *Id.* at 507.  The insurance policy covering the building contained provisions nearly identical to the Policy at issue here, including an exclusionary clause for defects in construction or workmanship and an ensuing-loss clause.  *See id.* at 507–08.  The building owner conceded that welding was an act relating to the building's "construction" and that damage caused *by the welding itself* was excluded.  *Id.* at 508–10.  However, the owner contended that the *falling slag caused by the welding* was "separable from the welding operation" and thus not excluded by the construction or workmanship exclusions.  *Id.* at 511–13.  And because the damage to the windows resulted from the falling slag (and not the welding itself), the owner argued, the ensuing-loss clause reinstated coverage.  *Id.*

The Fifth Circuit disagreed.  *See id.* at 511–515.  "[A]n ensuing loss provision, is only triggered when one (excluded) peril results in a distinct (covered) peril, meaning there must be two separate events for the Exception to trigger."  *Id.* at 511–12. "Even if the damage caused by the falling slag were a 'covered peril,'" the court continued, "the welding project did not 'result in' a separate covered peril; the welding project and attendant falling slag was *itself* the peril."  *Id.* at 513 (emphasis in original).

To support this holding, the *Balfour Beatty* court reviewed caselaw on ensuing-loss clauses, including the Supreme Court of Texas's decision in *Fiess v. State Farm Lloyds*, 202 S.W.3d 744 (Tex. 2006).  In *Fiess*, the policy excluded "loss caused by . . . mold" but also

---

[13]   Slag consists of "the molten metal particles ejected in the process of welding."  *Evanston Ins. Co. v. Adkins*, No. 3:05-CV-02068, 2006 WL 2848054, at *7 (N.D. Tex. Oct. 4, 2006).

"cover[ed] ensuing loss caused by . . . water damage."  *Id.* at 746.  The insureds argued that, despite the mold exclusion, the policy covered mold damage "caused by . . . water damage" under the ensuing-loss clause.  *Id.* at 745–48.

The *Fiess* court rejected this argument.  *Id.* at 748–50.  The court did not "think that a single phenomenon that is clearly an excluded risk under the policy was meant to become compensable because in a philosophical sense it can also be" characterized as a covered peril.  *Id.* at 750 (quoting *Aetna Cas. & Sur. Co. v. Yates*, 344 F.2d 939, 941 (5th Cir. 1965) (Friendly, J., sitting by designation)).

The *Balfour Beatty* court also discussed an out-of-state case, *Viking Construction, Inc. v. 777 Residential, LLC*, 210 A.3d 654 (Conn. App. Ct. 2019).  *See Balfour Beatty*, 968 F.3d at 513–14.  There, the Connecticut court held that an ensuing-loss clause did not reinstate coverage over a claim arising from damage to windows caused by the insured's power washing of a building's concrete façade.  *Viking Constr.*, 210 A.3d at 657–58, 664.  The court explained that an ensuing-loss clause only reinstates coverage if an excluded peril "causes a covered peril, such as a fire, and that *latter peril*" causes the damage.  *Id.* at 665 (emphasis added).  Because "there was only one cause" of the loss—the spraying of the building and its attendant damage to the windows—the ensuing-loss clause did not apply.  *Id.*

These cases, and others like them, supported the *Balfour Beatty* court's "holding . . . that an ensuing loss provision is only triggered when the ensuing loss is distinct from the excluded loss."  *Balfour Beatty*, 968 F.3d at 514.

As in *Balfour Beatty*, *Fiess*, and *Viking Construction*, the damage to the individual pipe components is not "distinct" from Paragon's defective construction and workmanship of the fabricated pipes.  Rather, the damage to the pipe components was concomitant with Paragon's "act[s] of . . . construction [or] workmanship," (Dkt. No. 37-1 at 60)—much like "[t]he damage to the exterior glass at [the building] was concomitant with [the] welding operations [in *Balfour Beatty*], much like the damage to the windows in *Viking Construction* was concomitant with the power washing, and much like the mold in *Fiess* was concomitant with the water damage."  *Balfour Beatty*, 968 F.3d at 513.

In this case, the damage to the individual pipe components was the direct and unmediated result of Paragon's defective construction and workmanship of the fabricated pipes.  The ensuing-loss clause therefore does not reinstate coverage for damage to the individual pipe components or any loss that follows.

* * *

Markel argues that Corval's coverage claim is excluded under the Policy and that as a result, Markel did not breach its contract with Paragon.  (Dkt. No. 36 at 12).  Given the analysis above, the Court agrees.  Markel is therefore entitled to summary judgment on Corval's breach-of-contract claim.

### B.        EXTRACONTRACTUAL CLAIMS

Corval also asserts two extracontractual claims for violations of Sections 541 and 542 of the Texas Insurance Code.  (Dkt. No. 1 at 11–16).  Markel argues that it is entitled to summary judgment on the extracontractual claims because Corval's breach-of-contract claim fails.  (Dkt. No. 36 at 15–17).  Corval does not seem to dispute this.  Instead, Corval

argues that material fact issues exist as to the breach-of-contract claim and that summary judgment is therefore improper as to the extracontractual claims. (*See* Dkt. No. 38 at 22–23).

The Court agrees with Markel. "The general rule is that an insured cannot recover policy benefits for an insurer's statutory violation if the insured does not have a right to those benefits under the policy." *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 490 (Tex. 2018). Here, because Corval's breach-of-contract claim fails as a matter of law, Corval cannot establish that it has a right to benefits under the Policy. And although Texas law sometimes permits insureds to assert extracontractual claims if the insured can show an injury independent of the right to receive benefits, Texas courts have "yet to encounter" a successful independent-injury claim. *Menchaca*, 545 S.W.3d at 499–500.

An independent injury has not been shown or even claimed here. In response to Markel's assertion that "Corval has provided no evidence, nor can it, of an independent injury," (Dkt. No. 36 at 16), Corval simply reasserts its coverage claim, (*see* Dkt. No. 38 at 22–23). Indeed, the only damage that Corval has ever offered is the $1,631,585.00 figure—exactly the amount of Corval's coverage claim. (*See* Dkt. No. 1 at 2).

In short, Corval's extracontractual claims are inextricably tied to the coverage claim, and the coverage claim fails as a matter of law. Summary judgment is therefore proper on the extracontractual claims as well.

## IV.   CONCLUSION

Considering the above analysis, the Court **GRANTS** Markel's Motion for Summary Judgment. (Dkt. No. 35).

It is SO ORDERED.

Signed on September 30, 2024.

**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**